UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **RONNIE TORBERT,** | } |
| **Plaintiff,** | } |
| v. | } CASE NO. 7:08-CV-1042-RDP |
| **HEALTH ASSURANCE, LLC,** | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

This matter is before the court on the parties' cross-Motions for Summary Judgment. (Docs. # 31 and 33).[1] Plaintiff's sole claim against Defendant in this case is asserted under 42 U.S.C. § 1983 pursuant to the provisions of the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (Doc. # 1 at ¶ 4). Plaintiff alleges that Defendant acted with deliberate indifference towards his diabetic condition while he was a pre-trial detainee in the Jefferson County Jail. (Doc. # 1 at ¶ 16). After careful consideration of the parties' briefing on each motion, the relevant law, and the record as a whole, the court finds that Plaintiff's motion is due to be denied, Defendant's motion is due to be granted.

**I.     Facts**

From February 9, 2007 through September 30, 2007, Defendant Health Assurance LLC ("HALLC" or "Defendant"), a private entity, contracted with the Jefferson County Sheriff to provide health care services to inmates at the Jefferson County Jail. (Doc. # 1 at 1; Doc. # 31, Ex. C).

---

[1] The court notes that Plaintiff's Motion for Summary Judgment as to Liability (Doc. # 33) was not filed within the time allowed for filing dispositive motions. Despite the fact that the timing of this filing shows a complete disregard for the court's orders, the court prefers to decide cases on the merits, rather than technicalities. Plaintiff's counsel should be aware, however, that she may not be awarded the same consideration in the future.

HALLC, in turn, contracted with Edwin M. Moyo, M.D. to provide physician services at the Jail. (Doc. # 31, Ex. D). HALLC also contracted with a local hospital to provide emergency inmate care. (Doc. # 31, Ex. Q). On March 4, 2007, Torbert was arrested for theft of property and was thereafter a pretrial detainee in the custody of the Jefferson County Jail. (Doc. # 1 at 1; Doc. # 31, Exs. A and H at 9-10). During Torbert's pre-trial detention, HALLC had a contract with Cooper Green Hospital whereby Cooper Green would provide the Jail inmates with medically necessary inpatient services at its facility. (Doc. # 31, Ex. R).

Torbert is diabetic.[2] (Doc. # 1 at 3). He is considered a "brittle diabetic" whose blood sugar fluctuates a great deal even with proper treatment. (Doc. # 33-3 at 63). Torbert controls his diabetes with insulin injections. (Doc. # 1 at 3). Torbert does not maintain an exercise routine or attempt to control his diabetes with a low-carbohydrate diet. (Doc. 31, Ex. B at 58-60). Diabetic ketoacidosis ("DKA") occurs when the body lacks adequate insulin and the body fat breaks down into ketone bodies. (Doc. 31, Ex. E at 33-34). Lack of insulin, provocation of illness, stress, lack of exercise, and a diet high in carbohydrates can all cause DKA. (Doc. 31, Ex. E at 35; Doc. 31, Ex. K at 71).

Torbert has experienced DKA or other diabetes-related complications at least four times since his diagnosis. (Doc. 31, Ex. V at 51-52; Doc. 31, Ex. J at 59-61). During his prior diabetic episodes, Torbert experienced such symptoms as left-side weakness, extremely high blood sugars, extremely low blood sugars, seizures, and hypoglycemia. (Doc. 31, Ex. J at 59-61). Torbert's most recent hospitalization for diabetes-related issues occurred approximately three weeks prior to his incarceration. (Doc. # 31, Ex. H at 23-25 and Ex. Y thereto).

---

[2] Torbert testified at his deposition that he is a Type II diabetic, but his treating physician testified that he has Type I diabetes. (*Compare* Doc. # 31, Ex. H at 12 *and* Doc. # 31, Ex. E at 21).

Following his arrest, and upon his incarceration, Torbert completed an intake form at the Jail. On this form, Torbert indicated that he is a diabetic and that his basal insulin dosage was 32 units of 70/30 insulin in the morning and 28 units in the evening. (Doc. # 31, Ex. Z). Torbert's actual prescription at the time of his arrest prescribed 28 units of 70/30 insulin in the morning and 21 units in the evening. Torbert admitted to self-adjusting his dosage. (Doc. # 31, Ex. H at 34-36).

HALLC's Health Care Services Policies and Procedures Manual, "Diabetes Nursing Protocol," required that, during the inmate intake process, the healthcare staff document if an inmate took insulin, verify the inmate's medications, and start the inmate on the diabetic diet and the sliding scale of regular insulin. (Doc. # 31, Ex. S). The sliding scale is something that, as a diabetic, Torbert practices on his own. (Doc. # 33-1 at 13-14, 53-54). Torbert testified that when his blood sugar is high despite taking his regular (70/30) insulin dosages, then he takes two units of regular insulin for every 50 points over 150 his blood sugar registers (*i.e.*, a sliding scale). (Doc. 33-1 at 13-14).

HALLC's policy further requires that each inmate's professed prescriptions be verified with his pharmacy or physician. (Doc. # 31, Ex. T at 87). Both Torbert and his treating physician agree that this is a prudent practice. (Doc. # 33-1 at 74-75; Doc. 33-3 at 70). The Protocol required that a diabetic inmate's blood sugar levels be tested twice a day. (Doc. # 31, Ex. S). The protocol also set forth a sliding scale to determine the amount of regular insulin that might be needed in addition to the inmate's regular prescription. (Doc. # 31, Ex. S). For each blood sugar level above 150, the sliding scale lists the number of regular insulin units to administer in addition to the basal insulin prescription. (Doc. # 31, Ex. S). The protocol also provides that if an inmate's blood sugar level rises above 400, staff is to check the inmate's mental status, vital signs, check for signs of dehydration, call the physician, and check the blood sugar again in two hours. (Doc. # 31, Ex. S).

At the jail, pursuant to HALLC's Diabetic Nursing Protocol, Dr. Moyo initially ordered that Torbert be placed on a diabetic diet and placed on a sliding scale of regular insulin, until his prescription could be verified. (Doc. # 31, Ex. Z). Thereafter, once Torbert's prescription was verified, Dr. Moyo prescribed Torbert 28 units of 70/30 insulin in the morning and 21 units in the evening, the dosage indicated on Torbert's most recent prescription. (Doc. # 31, Ex. Z). After an inmate's prescription is verified, there is no reason the inmate should not be given the prescribed dose. (Doc. # 33-4 at 51). It is the nurse's duty to follow written orders. (Doc. # 33-4 at 51). Plaintiff claims that every time he was administered insulin before being admitted to Cooper Green, he was given a sliding scale of regular insulin. (Doc. # 33-1 at 73).

Defendant's records show that Torbert's blood sugar level was 213 upon intake on March 5, 2007; 312 on the morning of March 5, 2007; 541 on the evening of March 5, 2007; 201 on the morning of March 6, 2007; 265 on the evening of March 6, 2007; 235 on the morning of March 7, 2007; 501 on the evening of March 7, 2007; and 376 on the morning of March 8, 2007. (Doc. # 31, Ex. Z).

On the evening of March 5, after Plaintiff's blood sugar tested 541, according to protocol, he was given 10 units of regular insulin, or the maximum allowed under the diabetic protocol sliding scale. (Doc. # 31, Ex. Z; Doc. # 33-4 at 41-42.). Because Plaintiff was ambulatory and his asymptomatic, he was allowed to return to his cell. (Doc. # 33-4 at 31-32, 41-43). He apparently passed out after returning to his cell and was returned to the medical clinic, where he was again administered insulin and his vital signs were checked. (Doc. # 33-4 at 43 - 46).

According to Defendant's records, Plaintiff's insulin prescription had been verified by March 6, 2007, because at 4 p.m. on that date, the records reflect that he was administered 21 units of 70/30

4

insulin. (Doc. # 33-4 at 26-27). Due to his elevated blood sugar level, he was also administered 6 units of regular insulin according to the Diabetic Protocol's sliding scale. (Doc. # 33-4 at 26-27). On the morning of March 7, Defendant's records show that Plaintiff was not given his prescribed dose of 28 units of 70/30 insulin. (Doc. # 33-4 at 46-47). Instead, based upon his blood sugar results, he was administered 4 units of regular insulin according to the sliding scale. (Doc. # 31, Ex. Z). However, Defendant's records show that he was again given his prescribed dose of 70/30 insulin on the morning of March 8. (Doc. # 33-4 at 46-47).

On the morning of March 8, the Plaintiff complained to the jail guard that he was throwing up and could not eat his breakfast. (Ex. EE at 84). Upon hearing these complaints and witnessing Torbert throw up, the guard sent him to the jail's medical clinic. (Doc. # 31, Ex. EE at 84-85). When he got to the medical clinic, the nurse checked Torbert's blood sugar. (Doc. # 31, Ex. EE at 86). Torbert's blood sugar level was 376. (Doc. # 31, Ex. Z). Defendant's records show that the nurse administered 28 units of basal insulin, plus a 10 unit boost of regular insulin pursuant to the sliding scale. (Doc. # 31, Ex. Z). After administering the insulin and checking Plaintiff's mental status, the nurse allowed Mr. Torbert to go back to his cell. (Doc. # 31, Ex. EE at 86; Doc. # 33-4 at 46-47). Upon returning to his cell, Torbert testified that he continued vomiting. (Doc. # 31, Ex. EE at 87-88). At approximately 12:30 p.m., Torbert was sent to the medical clinic again. (Doc. # 31, Ex. EE at 87-88). Torbert's blood sugar was recorded as 261. (Doc. # 31, Ex. Z). At this time, Dr. Moyo ordered that Mr. Torbert be transferred to Cooper Green Hospital. (Doc. # 31, Ex. Z, Nurse's Progress Notes and Physician's Progress Notes of March 8, 2007). At 1:00 p.m., an ambulance had been called to take Torbert to Cooper Green Hospital. (*Id.*). The 1:00 p.m. physician notes indicate that Torbert had departed the Jail for Cooper Green, and that he was stable upon departure. (*Id.*).

Torbert was released from the hospital four days later and is not aware of any lasting effects of this event. (Doc. # 31, Ex. H at 8-9).

The crux of Plaintiff's claim in this case is that he was not given his proper insulin dosage and went into DKA due to improper treatment. (Doc. # 33-1 at 45). Plaintiff testified that the nurses at the jail only gave him the sliding scale insulin rather than trying to confirm his prescribed dose. (Doc. # 33-1 at 78-82). Although Plaintiff has alleged that Defendant had a pattern and practice of treating diabetic inmates improperly, he is not aware of any other inmates having issues similar to his own, such as throwing up, fainting, or needed to be transported to the hospital. (Doc. # 33-1 at 74-78). He has merely heard general complaint from inmates, only one of which he could name. (Doc. # 33-1 at 76).

## II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

**III.   Discussion**

    **A.   Plaintiff's Section 1983 Claims Alleging Violations of his Rights Under the Fourth, Fifth and Eighth Amendments Fail as a Matter of Law.**

Plaintiff's Section 1983 claims alleging violations of his rights under the Fourth, Fifth and Eighth Amendments to the United States Constitution fail as a matter of law.  The Fourth Amendment applies only to unreasonable searches and seizures and the right to be free from the use of excessive force.  *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).  Plaintiff's complaint is devoid of any allegations of this nature.  The Fifth Amendment only applies to conduct of federal, rather than state, officials.  *Riley v. Camp*, 130 F.3d 958, 972 n.19 (11th Cir. 1997).  No federal actors are alleged to have been involved in this case.  The Eighth Amendment does not apply here because Plaintiff, at the time of the alleged constitutional violations, was not a convicted prisoner. *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  Therefore, Defendant is entitled to judgment as a matter of law on the alleged constitutional violations under the Fourth, Fifth and Eighth Amendments.

### B. Defendant is Entitled to Summary Judgment on Plaintiff's Section 1983 Claims Alleging A Violation of his Rights Under the Fourteenth Amendment

Title 42 U.S.C. § 1983 imposes liability on one who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." To state a claim under Section 1983, a plaintiff must allege that: (1) defendants deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. *U.S. Steel, LLC v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001); *Arrington v. Cobb County*, 139 F.3d 865, 872 (11th Cir. 1998).

Plaintiff alleges that Defendant acted with deliberate indifference to his medical needs. "[D]eliberate indifference to [the] serious medical needs of [a] prisoner [ ] constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Campbell v. Sikes*, 169 F.3d 1353 (11th Cir. 1999). However, because Plaintiff was a pre-trial detainee, rather than a prisoner, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, applies. *Goebert v. Lee County*, 510 F.3d 1313, 1326 (11th Cir. 2007) (citing *Snow ex rel Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir. 2005)). Nevertheless, the analysis applicable under the Fourteenth Amendment is identical to that under the Eighth Amendment. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979); *Goebert*, 510 F.3d at 1326; *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005).

"To prove a deliberate indifference claim, a plaintiff must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference

and the plaintiff's injury." *Danley v. Allen*, 540 F.3d 1298, 1310 (11th Cir. 2008). "To establish the intent element of a deliberate indifference claim, a '[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" *Danley*, 540 F.3d at 1312 (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)).

"When a private entity like [HALLC] contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state." *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997) (citing *Howell v. Evans*, 922 F.2d 712, 724 (11th Cir. 1991), *vacated pursuant to settlement*, 931 F.2d 711 (11th Cir. 1991), *reinstated by unpublished order* (June 24, 1991); *see also Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir.1986); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985). "In so doing, it becomes the functional equivalent of the municipality." *Buckner*, 116 F.3d at 452. However, when a corporate medical provider is a defendant, liability can only be imposed against it for a *policy or custom* that is deliberately indifferent to a serious medical need. *Buckner*, 116 F.3d at 452-53. "[I]t is well established that a municipality [or its functional equivalent] may not be held liable under section 1983 on a theory of respondeat superior" based on the acts of its subordinates. *Davis v. DeKalb County School Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000) (citing *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978)).

Therefore, to impose liability on HALLC, Plaintiff must identify a HALLC "policy" or "custom" that caused his injuries. *Davis*, 233 F.3d at 1375 (citing *Board of County Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 403 (1997)); *see also Powell v. Barrett,* 496 F.3d 1288, 1318 (11th Cir. 2007). "[A] policy is a decision that is officially adopted ... or created by an official of

9

such rank that he or she could be said to be acting on behalf of the [entity]." *Goebert*, 510 F.3d at 1332 (citing *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). The Eleventh Circuit has "defined custom as 'a practice that is so settled and permanent that it takes on the force of the law.'" *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quoting *Wayne v. Jarvis*, 197 F.3d 1098, 1005 (11th Cir. 1999) (in turn quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir.1997), *cert. denied*, 522 U.S. 1075 (1998))). "In order for a plaintiff to demonstrate a policy or custom, it is 'generally necessary to show a persistent and wide-spread practice.'" *McDowell*, 392 F.3d at 1290 (quoting *Wayne*, 197 F.3d at 110) (internal quotations and citations omitted).

As noted above, the crux of Plaintiff's claim in this case is that Defendant was indifferent to his diabetes by failing to give him his prescribed insulin dosage, thereby causing him to go into ketoacidosis and require hospitalization. (Doc. # 33-1 at 45). Plaintiff claims that his DKA was caused by (1) the failure by the nurses at the jail to confirm his prescribed dose and, (2) the fact that he instead allegedly received only the sliding scale of regular insulin. (Doc. # 33-1 at 78-82).

The evidence in the Rule 56 record shows that before Plaintiff went into DKA and was transported to the Cooper Green Hospital around mid-day on March 8, 2007, he had been given 8 doses of insulin. (Doc. # 31, Ex. Z). He was administered insulin at approximately 6:00 a.m. and 4:00 p.m. of each day of his incarceration. (Doc. # 31, Ex. Z). Plaintiff does not contest the fact that Defendant had to confirm his proper insulin prescription, but claims that his DKA was caused by Defendant's nurses' failure to give him the prescribed insulin after the prescription had been confirmed. (Doc. # 33-1 at 74-75; Doc. 33-3 at 70). The record before the court does not establish precisely when Plaintiff's prescription was confirmed, but Defendant's records show that he was first

administered his prescribed dose at approximately 4:00 p.m. on March 6, 2007. (Doc. # 31, Ex. Z). Thereafter, according to Defendant's records, on only one occasion, at 6:00 a.m. on March 7, 2007, was Plaintiff not given his prescribed insulin. (Doc. # 31, Ex. Z). Plaintiff claims he was never given his prescribed insulin and was always given regular insulin on the sliding scale. Either way, however, assuming that this failure to give Plaintiff his prescribed insulin caused his DKA, Defendant cannot be held liable under Section 1983 for that failure.

HALLC can only be held liable under Section 1983 if one of its policies or customs harmed Plaintiff. *Buckner*, 116 F.3d at 452-53. Under HALLC's policy, Plaintiff *should have* been given his prescribed insulin plus a sliding scale of regular insulin as needed. (Doc. # 31, Ex. S). The fact that this did not happen was a *deviation* from HALLC's policy. Because the conduct about which Plaintiff complains cannot be attributed to a policy or custom of HALLC, HALLC cannot be held liable under Section 1983.

Plaintiff also alleges that Defendant had a pattern and practice of treating diabetic inmates improperly. Thus, presumably, he argues that although the failure to give him his prescribed insulin was a deviation from HALLC's written policy, such deviations were a "custom" at HALLC. However, there is absolutely no evidence in the Rule 56 record to support such an assertion. Plaintiff testified that he is not aware of any other diabetic inmates having issues similar to his own, such as vomiting, fainting, or needing to be transported to the hospital. (Doc. # 33-1 at 74-78). He testified that he had merely heard general complaints from inmates, only one of which he could name. (Doc. # 33-1 at 76). Because he has only alleged a single event[3] which affected him, and because he has

---

[3] Citing the deposition testimony of Dr. Peter Lodewick, Plaintiff claims that he was administered "a very significant inappropriate insulin dosage." (*See* Doc. # 33 at 13; Doc. # 33-1 at 46).

11

failed to put forward any evidence showing that any other diabetic inmate was not given his prescribed insulin after his prescription had been confirmed, Plaintiff cannot establish that it was a custom for HALLC employees to deviate from the HALLC's official policy. Thus, Plaintiff is unable to establish his Section 1983 claim against HALLC on this theory.

At most, the evidence shows that, with regard to a single inmate, there was a deviation from policy by a HALLC employee which may have caused his DKA. However, "it is well established that a municipality [or its functional equivalent] may not be held liable under section 1983 on a theory of respondeat superior" based on the acts of its subordinates *Davis v. DeKalb County School Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000). Thus, there is not a material issue of fact here and Defendant HALLC has shown that it is entitled to summary judgment in its favor.

### IV. CONCLUSION

For the above reasons, the court concludes that (1) the Motion for Summary Judgment as to Liability by the Plaintiff (Doc. # 33) is due to be denied, and (2) the Motion for Summary Judgment of Defendant Health Assurance, LLC (Doc. # 31) is due to be granted. An order consistent with this Memorandum Opinion will be entered separately.

**DONE** and **ORDERED** this ___29th___ day of September, 2010.

                                            **R. DAVID PROCTOR**
                                            UNITED STATES DISTRICT JUDGE